**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LORRAINE FRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. 4:26-cv-1190 |
| v. | ) | |
| | ) | |
| VITALCORE HEALTH STRATEGIES, LLC, | ) | JURY TRIAL DEMANDED |
| THERESA CUMMINGS, ERIN MILLER, | ) | |
| COURTNEY EAVES, MADISON BAISCH, | ) | |
| MELISSA SELLERS, LONNIE MOCH, | ) | |
| MIKAYLA MCDANIEL, | ) | |
| JOYCE BRUNE, UNKNOWN NURSE 1, | ) | |
| UNKNOWN MEDICAL SUPERVISOR, | ) | |
| ANDREW DICKINS, JOSEPH SMITH, | ) | |
| RYAN BELOW, USTAVIO RODRIGUES, | ) | |
| UNKNOWN CORRECTIONS OFFICERS 1-4, | ) | |
| MICHAEL YOUNT,  UNKNOWN | ) | |
| LIEUTENANT, and | ) | |
| ST. CHARLES COUNTY, MISSOURI, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Christopher Griffith was a 39-year-old father, son, and partner when he was booked in the St. Charles County Jail on May 22, 2024. Christopher worked driving a pallet truck to support his family, including his four-year-old daughter. Like thousands of other Missourians, Christopher lived with a fentanyl addiction. Soon after booking, Christopher began to repeatedly vomit, and in the following days, he visibly deteriorated and stopped being able to keep down any food. His symptoms were ignored, even as he repeatedly told jail employees that he felt like he was dying. Rather than providing care, St. Charles Jail employees called him a "pussy," and medical employees of VitalCore accused him of faking his dire symptoms. After seven days of misery and obvious distress, Christopher slumped over his toilet and died. His death was entirely preventable

1

and the result of the St. Charles Jail and VitalCore employees' deliberate indifference to his obvious, life-threatening medical needs.

Lorraine Fry, Christopher's mother, brings this action on behalf of Christopher's family against VitalCore, St. Charles County, and their employees.

## PARTIES

1. At all times pertinent, the decedent Christopher Griffith was a citizen of the United States and a resident of the State of Missouri.

2. Plaintiff Lorraine Fry is the mother of Christopher Griffith. She brings this action pursuant to 42 U.S.C. § 1983 and Missouri statutes governing wrongful death actions (section 537.080, RSMo. 2018, et seq). She is a Missouri resident.

3. Plaintiff is an appropriate party to bring this action pursuant to § 537.080, RSMo.

4. Defendant St. Charles County, Missouri is municipality in the state of Missouri and operates the St. Charles County Department of Corrections ("SCCDOC").

5. Defendant St. Charles County has control of the budget and authorization for deputies and jailers of the SCCDOC, who in turn control and operate the SCCDOC.

6. Defendant St. Charles County established and/or delegated to Defendant VitalCore and/or other employees the responsibility of establishing and implementing policies and customs of the jail regarding medical care, medical screenings, safety screenings, medical monitoring, and basic care of each arrestee/detainee/inmate; and for implementing policies and customs for training other jailers and employees on the same.

7. Defendants Joseph Smith, Ryan Below, Ustavio Rodrigues, Michael Yount, Unknown Corrections Officers 1-4 ("Defendant COs"), and Unknown Lieutenant were employees of St. Charles County during all relevant times in this case.

2

8.      Defendant VitalCore Health Strategies, LLC ("VitalCore"), was, and is, a Kansas limited liability company authorized to do business within the jurisdiction of St. Charles County, Missouri, which lies in the Eastern District of Missouri. Defendant VitalCore regularly conducts business in St. Charles County, Missouri, which lies in the Eastern District of Missouri, in conjunction with Defendant St. Charles County.

9.      Defendants Theresa Cummings, Courtney Eaves, Joyce Brune, Madison Baisch, Melissa Sellers, Mikayla McDaniel, Erin Miller, and Andrew Dickins ("Nurse Defendants") are all Missouri residents and were contracted and/or employed by VitalCore to provide nursing to inmates housed at the SCCDOC where Christopher was confined and where the acts and omissions that gave rise to his claims occurred.

10.     Defendant Lonnie Moch is a Missouri resident who was contracted and/or employed by VitalCore to work as a nurse practitioner to inmates housed at the SCCDOC where Christopher was confined and where the acts and omissions that gave rise to his claims occurred.

11.     Defendant Unknown Medical Supervisor was a medical practitioner whose job was to supervise the medical care at the SCCDOC and ensure that all detainees were receiving the necessary medical care.

12.     Because of their employment for VitalCore, all Nurse Defendants, Defendant Moch, and Defendant Unknown Medical Supervisor all had a contractual duty to provide medical care for Christopher.

13.     At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

14.      All of the individual Defendants are persons under § 1983.

## JURISDICTION AND VENUE

15.      This cause is brought pursuant to 42 U.S.C. § 1983.

16.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), since the Defendants are located, and all the incidents giving rise to this suit occurred, in this judicial district.

## FACTS

**Day 1, May 22, 2024: Defendants Are on Notice of Christopher's Severe Medical Condition**

17.      In May of 2024, Christopher Griffith worked at a factory to support his long-time girlfriend and their four-year-old daughter. Christopher and his family lived near Wright City, Missouri.

18.      On the morning of May 22, 2024, Christopher was arrested on a misdemeanor warrant early in the morning by Wright City police officers on his way to work.

19.      At approximately 3:00 pm, Christopher was transferred to and booked at the St. Charles County jail, operated by the St. Charles County Department of Corrections ("SCCDOC").

20.      During a SCCDOC pre-booking healthcare screen taken by Nurse Courtney Eaves at around 3:30 pm, Christopher truthfully indicated that he was withdrawing from fentanyl and last used fentanyl at 5:00 am that morning.

21.      At another screening at approximately 4:00 pm conducted by Nurse Theresa Cummings, Christopher again clearly communicated he was withdrawing from fentanyl. He reported that he had used fentanyl daily for at least the past month and that he used the drug multiple times per day.

4

22.     At this nurse screening, Nurse Cummings assigned Christopher to be regularly evaluated via the Clinical Opiate Withdrawal Scale ("COWS") scale. Nurse Cummings also prescribed Christopher a mix of comfort medications often used to mitigate symptoms of opioid withdrawal. Upon information and belief, this withdrawal medication mix was prescribed pursuant to VitalCore's standard opioid detox practice or policy.

23.     Christopher's self-reported opioid use demonstrated that he lived with Opioid Use Disorder ("OUD"). OUD is a chronic brain disease. It negatively impacts the brain's dopamine system, which is crucial for cognitive functions necessary for survival. Symptoms of this disease include uncontrollable cravings for and compulsive use of opioids despite their negative consequences, decreased sensitivity to opioids, and often excruciating withdrawal pain and suffering.

24.     OUD often results in death. Fentanyl overdose is the leading cause of death for people ages 18 to 45 in Missouri.[1] Additionally, patients with OUD in a general healthcare system demonstrate alarmingly high morbidity and mortality. Numerous studies have shown that OUD is associated with elevated morbidity, mortality, and other adverse health and social conditions.

25.     At the same 4:00 pm nurse screening, Nurse Cummings also prescribed Christopher to receive a cardiac exam, described as "CCCI, CC-Cardiac-Initial," though she did not denote why she was prescribing this exam. This cardiac exam never occurred, even though Christopher would be jailed at SCCDOC for another six days.

---

[1] https://health.mo.gov/data/opioids/#:~:text=Drug%20overdose%20deaths%20continue%20to,death%20(see%20graphic%20below).

26.     At approximately 8:36 pm, Nurse Brandy Crowder conducted Christopher's first COWS evaluation, rating him a 7 (scoring 2 for a pulse rate of 102, 1 for restlessness, bone or joint aches, runny nose, GI upset, and anxiety).

27.     COWS is a clinical scale used to assess opioid withdrawal symptoms. It requires an objective medical professional to evaluate the individual who is withdrawing between 0-4 on 11 categories of symptoms: resting pulse rate, sweating over the past half hour; restlessness; pupil size; bone or joint aches; runny nose or tearing; gastrointestinal upset over the last half hour; tremor; yawning; anxiety or irritability; and gooseflesh skin. Each category of symptoms receives a rating from 0 to 4 or 5, based on severity; one's total COWS score is the sum of the scores for each symptom category. When properly evaluated, a total COWS score of 5-12 indicates "mild" withdrawal, 13-24 indicates "moderate" withdrawal, 24-36 indicates "moderately severe" withdrawal, and over 36 indicates "severe" withdrawal. A copy of the American Society of Addiction Medicine official flow sheet for evaluating COWS is reproduced in the images below.

6

# Clinical Opiate Withdrawal Scale (COWS)

**Flow-sheet for measuring symptoms for opiate withdrawals over a period of time.**

For each item, write in the number that best describes the patient's signs or symptom. Rate on just the apparent relationship to opiate withdrawal. For example, if heart rate is increased because the patient was jogging just prior to assessment, the increase pulse rate would not add to the score.

| Patient's Name:_____    Date: _____ Enter scores at time zero, 30min after first dose, 2 h after first dose, etc. Times: _____ _____ _____ _____ | | | | |
|---|---|---|---|---|
| **Resting Pulse Rate**: (record beats per minute)<br>*Measured after patient is sitting or lying for one minute*<br>0 pulse rate 80 or below<br>1 pulse rate 81-100<br>2 pulse rate 101-120<br>4 pulse rate greater than 120 | | | | |
| **Sweating:** *over past ½ hour not accounted for by room temperature or patient activity.*<br>0 no report of chills or flushing<br>1 subjective report of chills or flushing<br>2 flushed or observable moistness on face<br>3 beads of sweat on brow or face<br>4 sweat streaming off face | | | | |
| **Restlessness** *Observation during assessment*<br>0 able to sit still<br>1 reports difficulty sitting still, but is able to do so<br>3 frequent shifting or extraneous movements of legs/arms<br>5 Unable to sit still for more than a few seconds | | | | |
| **Pupil size**<br>0 pupils pinned or normal size for room light<br>1 pupils possibly larger than normal for room light<br>2 pupils moderately dilated<br>5 pupils so dilated that only the rim of the iris is visible | | | | |
| **Bone or Joint aches** *If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored*<br>0 not present<br>1 mild diffuse discomfort<br>2 patient reports severe diffuse aching of joints/ muscles<br>4 patient is rubbing joints or muscles and is unable to sit still because of discomfort | | | | |
| **Runny nose or tearing** *Not accounted for by cold symptoms or allergies*<br>0 not present<br>1 nasal stuffiness or unusually moist eyes<br>2 nose running or tearing<br>4 nose constantly running or tears streaming down cheeks | | | | |

*American Society of Addiction Medicine official COWS Flowsheet, page 1*

*COWS / Flow-sheet format for measuring symptoms over a period of time*

| | | | | |
|---|---|---|---|---|
| **GI Upset**: *over last ½ hour*<br>0 no GI symptoms<br>1 stomach cramps<br>2 nausea or loose stool<br>3 vomiting or diarrhea<br>5 Multiple episodes of diarrhea or vomiting | | | | |
| **Tremor** *observation of outstretched hands*<br>0 No tremor<br>1 tremor can be felt, but not observed<br>2 slight tremor observable<br>4 gross tremor or muscle twitching | | | | |
| **Yawning** *Observation during assessment*<br>0 no yawning<br>1 yawning once or twice during assessment<br>2 yawning three or more times during assessment<br>4 yawning several times/minute | | | | |
| **Anxiety or Irritability**<br>0 none<br>1 patient reports increasing irritability or anxiousness<br>2 patient obviously irritable anxious<br>4 patient so irritable or anxious that participation in the assessment is difficult | | | | |
| **Gooseflesh skin**<br>0 skin is smooth<br>3 piloerrection of skin can be felt or hairs standing up on arms<br>5 prominent piloerrection | | | | |
| **Total scores**<br>**with observer's initials** | | | | |

Score:
5-12 = mild;
13-24 = moderate;
25-36 = moderately severe;
more than 36 = severe withdrawal

*American Society of Addiction Medicine official COWS Flowsheet, page 2*

28.    Because he self-reported withdrawing from opioids, Christopher was initially assigned to a unit specifically for detainees who were withdrawing.

29.    Based on his self-reported severe, frequent opioid use and opioid withdrawal symptoms, Defendants were put on notice of Christopher's serious medical conditions — OUD and opioid withdrawal syndrome — during his first day incarcerated at SCCDOC.

8

30.     VitalCore's medical providers also should have been aware that if Christopher began repeatedly vomiting or experiencing diarrhea, he would require intravenous fluids to properly re-hydrate, as all liquids and medicine he was attempting to consume would immediately exit his body. Any properly trained medical provider would be aware that intravenous fluids are required in such circumstances.

**Day 2, May 23, 2024: Christopher Demonstrates Signs of Medical Emergency**

31.     Early on the morning of May 23, Christopher was moved to a pod in SCCDOC referred to as Q1.

32.     At approximately 9:10 am, Nurse Courtney Eaves completed another COWS evaluation that purported to evaluate Christopher on the COWS scale.  She rated him a 7 (scoring 2 for a pulse rate of 119, 1 for restlessness, 1 for bone or joint aches, 1 for runny nose, 1 for GI upset, and 1 for anxiety and irritability).

33.     Despite this, Christopher's documented pulse rate of 119 was significantly up from 102 the previous day, and was nearly 120, which is the highest subcategory for pulse rate on the COWS scale, and warranted at least 2 points.

34.     Christopher was next given a COWS evaluation at approximately 8:00 pm. In a video recording of Nurse Joyce Brune's examination of Christopher, he appears extremely weak, unable to stand up, and his head is shiny with sweat. His resting pulse was 110, which is a sign of tachycardia.  The first words that he told the nurse was that he was "dizzy" and could not make it out of his cell. He stated that he is "not doing good," and is experiencing constant severe dizziness every time he moves. He also reported diarrhea, vomiting, numb fingertips, difficulty breathing, sweating, hot and cold chills, and inability to sit still. In a video of his examination, when a corrections officer opens Christopher's door, he says he literally cannot stand up because he is so

9

dizzy; his head is leaning against a wall as he verbally groans in pain. He says for symptoms of withdrawal he has "everything," "I feel like I am not breathing right," and "I don't know how I am going to get rest."

36. However, again improperly evaluating Christopher's COWS Scale, Nurse Brune gives him a COWS score of 9, only increasing his rating for "GI episodes" to 3, given he has recently vomited and had diarrhea. Nurse Brune failed to increase his rating for restlessness, sweating, anxiety, tremor, and gooseflesh skin – all of which Christopher reported, and would have elevated his COWS rating. Consistently elevating COWS scale ratings are essential for monitoring a patient's decline into medical emergency. Defendant Brune was aware of each of the above symptoms of Christopher's, including his tachycardia. She was also aware that Christopher had been ordered to have a cardiac exam and had still not had one. She failed to take any steps to obtain the necessary medical treatment for Christopher.

**Day 3, May 24, 2024: Christopher is Belittled While His Medical Crisis Intensifies**

36. On 6:15 am on May 24, 2024, Christopher reached out via emergency intercom for medical help. He received a special visit by a three VitalCore employees, including LPN Nurse Madison Baisch. Nurse Baisch reported that Christopher was experiencing chest pain and a burning sensation in his chest that began the previous day and has reached a pain level of "8 out of 10." Christopher also reported that he was having regurgitation. Nurse Baisch noted that Christopher should receive a "chest pain follow up" due to "no provider being present." Christopher never received this chest pain follow up.

37. Nurse Basich partially completed a form about the chest pain Christopher was suffering. Christopher's blood pressure was extremely high at this point, 170/90. Many of the worksheet entries on the form that were supposed to be completed by Nurse Baisch were left blank.

10

38.    Despite this, Defendant Lonnie Moch, a Nurse Practitioner, prescribed Christopher only Geri-Lanta without even personally examining him. Both Defendant Moch and Defendant Baisch were aware that Christopher had severe chest pain, that his pain was an 8, that he had burning sensation in the middle of his chest, that he was vomiting, that he had a pulse rate of 115, indicating ongoing tachycardia, and that he was having fainting episodes. They were also aware that Nurse Baisch had failed to complete the mandatory Nursing Clinical Guideline Flow Sheet correctly.  Despite this, they failed to identify or provide necessary medical care.

39.    At 8:13 am, Defendant Below was doing rounds when he looked into Christopher's cell and saw that Christopher had been vomiting repeatedly all over the cell. He had a cleaning crew clean the cell, and Christopher, shirtless, slowly and weakly walked to the shower where he attempted to clean himself. Defendant Below failed to notify medical providers that Christopher had been repeatedly vomiting and was weak.

40.    On his way to the shower, Christopher walked past Unknown Nurse 1, who was responsible for providing Christopher with his morning medication. She failed to give him his medication. Unknown Nurse 1 failed to document that she did not provide Christopher's prescribed medication to him. She also was aware that Christopher was vomiting profusely, yet she failed to document this fact. Because she had access to his entire medical file, she was aware that he was vomiting, that she had not provided him medication, that he had been experiencing tachycardia, that he had recently complained of chest pains, that the chest pain exam was not properly done, and that he had still not received a cardiac exam that was ordered on his booking.

41.    At 9:15 am, Nurse Cummings performed another COWS evaluation, rating him an 8. The evaluation lasted under ninety seconds. This COWS evaluation was again performed improperly, as Christopher had reported nausea, sweating, vomiting, diarrhea, anxiety, and an

11

inability to move. That morning, various corrections officers including Defendant Below even witnessed Christopher vomiting in his cell. However, in her evaluation, Nurse Cummings only scored Christopher a 1 for restlessness, 1 for bone or joint aches, 1 for GI upset, and 1 for anxiety. His resting pulse was 122, which would equate to 4 points. A resting pulse rate of 122 also indicates serious tachycardia, which is a serious medical need. If Christopher's symptoms had been properly evaluated, his COWS rating would be moderate to severe. Because she had access to the previous medical file, Nurse Cummings was also aware that Christopher had reported severe chest pain, that a chest pain follow up was going to happen, that he as supposed to have a cardiac exam, and that Christopher was suffering from tachycardia.

42.    At 10:44 am, Christopher slowly walked out of the pod. There are no records that indicate why he left the pod. Soon after, at 10:56 am, Unknown Corrections Officer 1 wheels Christopher back to his cell in a wheelchair because he was so ill he could not walk. On video, Christopher asks the corrections officer wheeling him whether there is a medical director he can speak to. The officer simply responded, "this is how it goes," ignoring the severity of Christopher's withdrawal. The unknown officer also failed to document that Christopher was not even strong enough to walk independently but rather needed assistance to be brought back up to his cell.  If Christopher was seen by a medical provider between 10:35 and 10:55 am, the medical providers completely failed to document it.

43.    At 2:46 pm, Officer Below was doing rounds when Christopher, from his cell, told him that it felt like "his heart stopped."  Defendant Below failed to report that to any medical provider.

44.    Defendant Below brought Nurse Eaves to Christopher. Below commanded, "get up," but Christopher clearly could not.  Officer Below watched Christopher while he repeatedly

12

dry heaved, lying on the floor of his cell, unable to move. For minutes, Officer Below and Nurse Eaves demanded Christopher stand up while he writhed on the floor in obvious misery.  Nurse Eaves saw that Christopher was unable to stand or walk independently. Eventually, Officer Below helped Christopher stand up and sit at a table with Nurse Eaves for an evaluation.

45.	Nurse Eaves told Christopher that she looked through the notes from the earlier call about chest pain, which demonstrated an obvious problem and which were clearly incomplete. He cursed and emphasized that he was "not faking," visibly unwell. In response to his cursing, Nurse Eaves threatened to send him back to his cell without medical treatment.

46.	Christopher told Nurse Eaves that he had been vomiting or dry heaving all day.  He said, "after this morning, I cannot vomit." Inability to vomit can indicate esophageal failure and/or severe and prolonged dehydration, mandating intravenous fluids. Nurse Eaves was aware that Christopher was unable to vomit and failed to document this or put this on a report.

47.	Minutes later, with his head in his hands, Christopher tells her, "I haven't vomited in half a day." Nurse Eaves again failed to document this. He told her that he vomited earlier in the day, but not since, "and then it's been nothing but dry heaving." She failed to document this. He told her that he is unable to eat. She failed to document this. He told her that "acid, or something" keeps coming up. She failed to document this.

48.	Rather than treating Christopher or reporting his serious concerns, Nurse Eaves said, "this is what happens when you use drugs."

49.	Nurse Eaves was further aware of the prior chest pain that Christopher had reported, including the fact that Nurse Baisch had improperly filled out a review of Christopher's chest complaints earlier in the day. She was aware of his weakness and vomiting. She was aware of his

tachycardia. Despite this, she failed to notify anybody of the problems or obtain additional health care for him.

50.     In response, Nurse Eaves simply stated, "I know it sucks, but this is detox," and told Christopher, "your vitals look great. You're fine. I get it, this sucks." At this evaluation, Nurse Eaves then evaluated Christopher's COWS Scale and rated him a 7, improperly failing to increase his rating above 1 for sweating, restlessness, bone or joint aches, GI upset, or anxiety and irritability, in plain violation of Christopher's severe and obvious symptoms.

51.     Any competent medical provider would have recognized that Christopher's symptoms, including an inability to vomit and difficulty standing and walking, demonstrated symptoms far beyond typical or mild opioid withdrawal.

52.      Following this interaction, Nurse Eaves failed to document any of the things that Christopher told her, including that he had been repeatedly vomiting and dry heaving. At this evaluation, Christopher's resting heart rate was 115, indicating tachycardia. Nurse Eaves was aware of the following at the point about Christopher: he was supposed to have a cardiac exam, he was very weak, he was experiencing tachycardia, he was supposed to have follow up for chest pain, and the chest pain form that had been performed on him was incomplete. Despite all of these facts, she did not obtain medical help for him.

53.     As he is led back to his cell, Christopher pleads to the correctional officer for a cell mate, saying that he wanted someone "to keep an eye on [him]."

54.     Just a few hours later, at 5:00 pm, Christopher activated his emergency intercom stating that he was going to hurt himself, that he felt suicidal, and that he was going to jump off the top bunk because he was in so much pain. Officer Below arrived and took Christopher out of his cell to a brief nurse evaluation. An inmate told Below that Christopher said he was "having a

14

heart attack." While walking with an unsteady gait to the nurse, on video, Christopher states, "it's not getting any better," and "I just want the misery to stop." Below was aware that Christopher said he was having a heart attack but failed to document this or notify anyone about it.

55.　During an evaluation with Nurse Cummings at 5:05 pm, Christopher on video states "I just want this to be over," and "my stomach is in knots." He was in obvious pain. Nurse Cummings was aware of Christopher's prior medical interactions earlier in the day, including his repeated vomiting, his chest pains, his inability to vomit, and his twice calling out specifically for medical help. Despite this Nurse Cummings fails to escalate Christopher's case at all. Moreover, Nurse Cummings completely overlooked part of a form that specifically asked about what medical issues Christopher had been experiencing besides his mental health issues. This nurse interaction lasts just a few minutes, and Nurse Cummings asks few if any questions. The mental health form which Nurse Cummings was supposed complete asked if Christopher "need[s] medical…health care." She failed to ask him that. He obviously did, and he told anybody who would ask.

56.　Following this evaluation, Christopher was brought to a suicide cell. Once in his cell in the suicide ward, Christopher continued to attempt to retch, or dry heave, into the toilet.

57.　Less than three hours later, at 7:30 pm, Christopher attempted to hang himself from his sink with a blanket. He was unsuccessful.

58.　Soon after, four corrections officer arrived as Christopher was lying on the concrete pavement, naked. They told him to get onto his mattress. He was unable to. When he does not, they used force against him, shoving him, handcuffing him, assaulting him, and removing the mattress from his room.

59.　One of the officers told Christopher, "We will mace you and let you marinate." At another point, they threatened to put him in a restraint chair.

15

60. Christopher said that he thought one of the officers "broke his ribs," which the officers dismissed by saying "he didn't break your ribs," and "you started it."

61. Nurse Eaves and another nurse returned a few minutes after the assault on Christopher. Nurse Eaves failed to get any vital signs from Christopher, instead noting that he "continue[d] to scream and curse at staff." Nurse Eaves took handwritten notes during this encounter and failed to preserve them.

62. An hour after the assault, at 8:34 pm, Christopher was again evaluated for his COWS Scale and rated a 10 by Nurse Eaves. His pulse had now risen to 135 beats per minute, dangerously high. Again, Nurse Eaves failed to properly evaluate Christopher's COWS Scale, rating him a 1 on sweating, restlessness, bone or joint aches, GI upset, tremor, and anxiety, and a 4 for his pulse rate. In the notes below this COWS evaluation, Nurse Eaves documented that Christopher stated, "I'm gonna drown myself in this toilet."

63. During this evaluation, Christopher's face is visibly drenched in sweat, he can barely move, and his anxiety and irritability is severe and debilitating, beyond a rating of 1 – he had literally attempted suicide 30 minutes earlier and was threatening to do so again. Christopher's COWS evaluation would have fallen within moderately severe or severe had he been properly evaluated. Because she had access to the previous medical file, Nurse Eaves was also aware that Christopher had reported severe chest pain, that a chest pain follow up was supposed to occur to happen, and that Christopher was suffering from tachycardia. She further was aware that Christopher was unable to walk independently. She failed to obtain medical assistance for him for these issues.

16

**Day 4, May 25, 2024:  Christopher Weakens Without Medical Intervention**

64.     Around 7:00 am on May 25, 2024, corrections officers arrived at Christopher's cell to give him breakfast. There was vomit around his toilet from the night before. After Christopher attempted to eat breakfast, he vomited at 7:13 am. His vomit was reddish black.

65.     Because of the use of force the previous day, Christopher was now forced to be handcuffed from behind every time he was removed from the cell.

66.     Around 7:25 am, Christopher's cell was searched, and the officer conducting the search on video stated that "everything is covered in vomit" and that Christopher had been "doing drugs" and is now "being a pussy about it." The officer, CO Joseph Smith, bragged to the fellow officers, "depending on his cooperation, I *might* let him take a shower after this." Christopher was barely able to move or communicate during their conversation. CO Smith did not allow him to take a shower.

67.     CO  Smith, CO Rodrigues, and Unknown CO 2 all knew that Christopher had been vomiting for days, knew he could barely stand, and they know that his vomit was a disturbing black-red hue. They failed to document this, report it to a medical provider, or to provide any medical care for Christopher related to these serious medical needs.

68.     Several minutes later, at 7:43 am, CO Below said that Christopher "pukes on himself every morning," and another CO told him that Christopher was "dry heaving in the afternoon" the prior day.  Below failed to document this or report this information to anyone.

69.     At approximately 10:00 am, Christopher met with Defendant Nurse Melissa Sellers. During this assessment, Christopher notified Nurse Sellers that he was unable to stand on his own, saying, "I need to sit down. I can't even breathe." However, Nurse Sellers did not ask

17

him any follow up questions or any questions at all while she took his vitals. His pulse was a dangerous 128 beats per minute, representing severe tachycardia. She never ran through the COWS evaluation; instead, she cut him off, stating, "you're having vomiting, nausea, diarrhea." Nurse Sellers had a computer, and thus had access to Christopher's entire medical file. Thus, she was aware that Christopher had been vomiting all week, that he had been experiencing tachycardia, that he had been vomiting profusely, that he had made complaints of severe chest pain, that he had not received the cardiac exam that had been recommended, and that he had been dry heaving.

70.     Once again, Nurse Sellers improperly completes Christopher's COWS Scale evaluation. She gives him a score of 8, rating him a 1 in restlessness, bone or joint aches, GI upset, and anxiety, despite the fact that he had vomited all morning and was in severe distress. She also failed to ask questions that would elicit answers to any of the COWS categories. Even though she noticed and documented that Christopher's "heart rate being increased," Nurse Sellers only encouraged Christopher to "drink plenty of fluids" and stated that she would provide Gatorade. However, guards then informed Christopher he was not allowed to have the Gatorade in his cell, making it useless for regular rehydration.

71.     When another inmate requested Gatorade, Defendant Smith said, "Fuck no. This is torture. You don't give people you're torturing Gatorade."

72.     Throughout the day of May 25, Christopher lay on the ground, nearly unmoving and in distress. He continued retching and experiencing diarrhea.

73.     At 6:11 pm, Nurse Sellers recorded that she conducted a mood survey of Christopher, that he did not report any symptoms of depression or anger, and that his anxiety was at a level 1. Video of Christopher in his cell from noon to midnight indicated that he did not ever meet with Ms. Sellers during this time. This survey was falsified.

18

74.     At approximately 8:00 pm, Nurse Cummings visited Christopher for another COWS evaluation. Christopher appeared severely depleted and was heavily breathing while leaning over, unable to stand without assistance. After barely asking Christopher any questions, Nurse Cummings gave him some pills and a small cup of Gatorade. She gave him a COWS Scale rating of 8, which is again improperly conducted, as she failed to rate him above 1 for anxiety, GI, sweating, or any other indications of his extreme withdrawal. Nurse Cummings failed to document the fact that Christopher was unable to stand without assistance.

75.     Christopher's pulse rate was recorded at this time as 140, which is critically high and considered within range of life-threatening danger, especially while one is withdrawing from drugs or alcohol. A resting pulse rate of 140 indicates severe stress on the cardiovascular system and requires immediate medical attention. Nurse Cummings was aware that Christopher had been vomiting for days, that he had been experiencing tachycardia, that he had complained of chest pain, that he was ordered to see a medical provider due to his chest pain, and that he had not received care due to his chest pain.   Despite all of these things, she failed to obtain additional medical care for him.

**Day 5, May 26, 2024: VitalCore Employees Skip Crucial Treatment for Christopher**

76.     Between 5:00 and 6:00 am on May 26, 2024, Christopher repeatedly attempted to crawl to his sink to get sips of water. In between sips of water, he writhed on the ground and retched into the toilet.

77.     At 7:35 am, officers searched Christopher's room. His breathing was labored, again.

78.     When his breakfast was delivered shortly around 7:45, he crawled on his hands and knees the six feet to the door of his cell.  He ate nearly none of his food.  Minutes later, Christopher spilled the tray of food because he did not have the strength to carry it back to the door.

79.     By 8:00 am, Christopher was offered an hour outside his cell, which he did not accept because he was unable to move.

80.     At 8:10 am, Christopher was examined by Defendant Nurse Mikayla McDaniel and Defendant Sellers. CO Smith yelled at him to put his suicide smock on, and Christopher repeatedly tells him that he was unable to put it on.  When he opened the door, Christopher slowly backed out, with labored breathing. Nurse McDaniel and Defendant Smith witness this. Christopher, already exhausted, leaned with his face against the wall. Nurse McDaniel and Defendant Smith witnessed this.  Despite Christopher's misery, Defendant Smith berated him for not putting his smock on correctly.  Defendants McDaniel and Sellers failed to document that Christopher was barely able to stand.

81.     On video, speaking to McDaniel and Sellers, whose job it was to provide medical care for him, Christopher says plainly, "I haven't ate in days." He receives no response. Nor do the nurses document this fact.  He was in clear agony. Rather than documenting each of the COWS categories, Defendant McDaniel simply asks Christopher what symptoms he has. He responds, "Everything." He says he has every symptom: diarrhea, vomiting, inability to sleep, upset stomach, fatigue.

82.      In response, the nurse simply advised drinking more Gatorade.

83.     Continuing his conversation with Defendant McDaniel, Christopher pleaded, "I think I need to go to the hospital and get an IV," "this is bad," "I don't think I can go in the shower, I don't think I can hold myself up," and finally, "I feel like I'm dying."  Defendants Sellers and

20

McDaniel failed to document any of this. Christopher was plainly breathing heavily despite being at rest. Even though he was sitting, he needed two corrections officers to hold him up.

84. When Christopher told the jailer he could not shower because he was unable to hold himself up in a shower, the jailer simply responded, "So you're refusing to take a shower?"

85. Christopher was correct that he required intravenous fluids to rehydrate, as he had been unable to keep down food or drink and experiencing diarrhea for five days. Instead, the nurse told him his suffering "is to be expected when you are coming off opiates," and to keep drinking Gatorade, try to stay hydrated, and keep the anti-nausea medications in his stomach. The anti-nausea medications were not working, nor was Christopher able to keep anything in his stomach.

86. Despite his obvious suffering, Christopher's COWS Scale rating was again improperly recorded by Nurse Mikayla McDaniel at 8:16 am as a 6. She failed to rate him above 1 for any symptom, including GI problems and anxiety or irritation. On video, Christopher's breath is clearly labored, yet Nurse McDaniel's COWS report states "respiration type unlabored." Both Nurse McDaniel and Sellers were aware of Christopher's labored breathing, his tachycardia, his complaints of chest pain, the fact that he had not yet had his chest problem examined, his diarrhea, and his vomiting for days on end. The nurses failed to elevate the problem to their supervisors, and failed to find a different treatment for Christopher's medical needs.

87. At 9:45 am, Defendant Sellers falsified a required "Brief Mood Survey," just as she had the previous evening. She did not meet with Christopher at any point during the 9:00 hour; the only brief interaction she had with him was at the COWS exam which she and Defendant McDaniel had incorrectly performed on Christopher at 8:15 am. The Mood Survey requires at least sixteen questions to be asked to Christopher. Sellers failed to ask any of them to Christopher.

21

88.     Around 11:30 am, Christopher had to crawl to his cell door to receive lunch. He ate only part of an apple. Within twenty minutes, he crawled to the toilet and appeared to vomit into the toilet.

89.     For the next four hours, Christopher lay on his mattress and did not do anything. Around 4:30 pm, he crawled to the toilet and, on his knees, keeled over in pain, retching.

90.     He received his dinner around 4:40 pm. Christopher received dinner and attempted to eat some of the food that looks like applesauce. He did not eat any of the other food, including corn or a sandwich, on his tray.

91.     By 6:45 pm, he was again retching.

92.     That evening, around 7:50 pm, Nurse Cummings appeared in Christopher's pod. Christopher was clearly too weak to stand up and walk out of the cell. At this point, Nurse Cummings was aware of all of Christopher's last week in the jail: his vomiting, his chest pains, the fact that he had not had the chest exam he was supposed to, his tachycardia, his inability to retain food or drinks, his weakness, his heavy breathing. Despite this, Nurse Cummings did not even walk near the door of Christopher's cell to look inside to see how he is doing.

93.     Instead, she simply left and documented that he refused a COWS Scale evaluation. Nurse Cummings failed to follow the policy of the form by reading it to Christopher. If she had even bothered to go over to his cell to read him the form, she might have noticed that he was deathly ill.

**Day 6,  May 27, 2024: Christopher is Visibly Dying, and Says So**

94.     Monday, May 27, 2024 was Memorial Day.  Christopher's girlfriend and their four-year-old daughter tried to enjoy the day outside while worrying about Christopher. Meanwhile, Christopher continued to deteriorate at the St. Charles County Jail.

22

95.     At 5:08 am, Christopher again crawled on his hands and knees to the toilet, too weak to walk or stand. He experienced more diarrhea at that time, and again several minutes later.

96.     He vomited, or attempted to vomit, two more times in the 6:00 am hour and at least another time in the following hour. He was served breakfast at 7:15 am, ate almost none of it, and began to vomit soon after trying to eat it.

97.     At 7:55, three corrections officers conducted a search of Christopher's cell. Christopher was lying on his mattress, unmoving. The three officers were CO Yount, Unknown CO 3, and Unknown Lieutenant.  The first thing he told them is, "I'm so weak." He could not stand or follow the corrections officer's directions to stand up or to put his suicide smock on. The guards disregarded their orders that Christopher stand or put his smock on, and instead they just handcuffed him as they searched his cell.

98.      In a plea for help, Christopher told the guards, "there is puke and shit everywhere." Rather than provide assistance, Unknown Lieutenant said, "it would be smart to move your [bed] mat near the toilet." In response, Christopher simply stated within earshot of all three, "I'm dying dude," and then said "It's like day seven [of withdrawal]."  All three of the Defendant officers were aware that Christopher was too weak to stand, that he had been vomiting and experiencing diarrhea for hours, that he breathed heavily after being pulled into a sitting-up position, and that he reported that he was "dying." None of these reported Christopher's status to medical providers or anyone else.

99.     Christopher vomited or retched again at 8:17 am and again at 8:48 am.

100.    At around 9:00, Nurse Andrew Dickins performed a COWS evaluation. Christopher was unable to even stand or get out of his cell; he sat on the toilet for the exam. Christopher's resting heart rate was 130, which indicates severe tachycardia. For the first time in

six days, Christopher received one rating for one symptomatic category above 1: he received a 2 in anxiety, sweating, and GI upset. However, Christopher's COWS rating was again improperly recorded, as Christopher receives an 8, which failed to account for his pulse rate being a 130, which should have added 4 points. In this evaluation, Nurse Dickins noted that Christopher is expressing thoughts of self-harm.  Nurse Dickens completely fails to document the fact that Christopher was unable to even stand on his own, or that the entire examination happened while Christopher was sitting on the toilet. Because he had access to Christopher's file, Defendant Dickins was aware of the following: Christopher had been experiencing tachycardia for days, Christopher had been vomiting for days despite receiving medication, Christopher was too weak to stand up, Christopher had complained of chest pain and not received care for his chest pain.  Dickins failed to obtain proper medical care for these serious medical needs that Christopher was experiencing

101.    In the following hours, Christopher repeatedly crawls to his toilet and vomits or retches. The floor of his cell has vomit on it.

102.    Christopher is served dinner at 4:23 pm. He eats almost none of it.

103.    Fifteen minutes later, Defendant Unknown Corrections Officer 4 comes into Christopher's cell because Christopher was too weak to bring his tray to the door. Defendant was aware that Christopher had been vomiting and was very weak. He was aware that Christopher had eaten almost no food. Despite this, Defendant failed to notify anybody about Chris's medical condition.

104.    Christopher vomits or retches again at 5:15 pm.

105.    Nurse Courtney Eaves walks into Christopher's pod around 5:30 pm. She was required to perform rounds on Christopher and conduct another "Brief Mood Survey." She completely failed to stop by his cell. Despite this, at 6:42 pm, Nurse Eaves falsely documents that

24

she conducted a brief mood survey, again negligently documenting Christopher's anxiety, depression, and anger scores are all 0. Meanwhile, he was actively on the verge of death. Nurse Eaves was aware of the following: Christopher had been experiencing tachycardia for days, Christopher had been vomiting for days despite receiving medication, Christopher was too weak to stand up, Christopher had complained of chest pain and not received care for his chest pain. Defendant Eaves failed to obtain proper medical care for these serious medical needs that Christopher was experiencing.

106.    At 7:53 pm, Nurse Erin Miller assesses Christopher's COWS scores. Christopher was heavily panting after standing. He states "I can't control anything." He requires help to be held up.  He falls down on the floor of the jail and needs two jailers to pick him up.  Just as Defendant Dickson performed the examination while Christopher was on the toilet, Defendant Miller performs her examination while Christopher was sitting on the ground outside of his cell, panting heavily.

107.    Defendant Miller gives him a COWS score of 3, again improperly conducting this evaluation. On video, during this evaluation, Christopher states that he has every symptom of withdrawal, that he "can't control anything," that he's in pain and cannot stand up, that he has very loose stools, and that he is breathing very hard. Christopher pleads, "take me to the hospital, please." In response, Nurse Miller simply gave Christopher the same comfort medications that are doing nothing to help him, and failed to document that Christopher could not stand, control his bowels, or stop vomiting. She reported that his pulse was 88.

108.    Defendant Miller was aware of the following: Christopher had been experiencing tachycardia for days, Christopher had been vomiting and experiencing diarrhea for days despite receiving medication, Christopher was too weak to stand up, and Christopher had complained of

25

chest pain and not received care for his chest pain.  Defendant Miller failed to obtain proper medical care for these serious medical needs that Christopher was experiencing.

109.    Between 11:00 pm and midnight, video shows Christopher wrapped around his toilet, repeatedly retching, struggling to breathe, then continuing to retch.

**Day 7, May 28, 2024: As Predicted, Christopher Dies Without Any Proper Intervention**

110.    At 3:15 am on Tuesday, May 28, 2024, video shows Christopher lying on the floor of his cell.

111.    At 3:30 am, Christopher attempted to sip some water and began struggling on his toilet. A female officer walked past and saw him sitting on his toilet.

112.    At approximately 3:38 am, after struggling to get off the toilet, Christopher stopped moving. He died, slumped over his toilet.

113.    An officer walked past Christopher's cell and looked in at 3:42 am but failed to note that Christopher was dead.

114.    Around 3:50 am, another officer saw Christopher dead in his cell and called for emergency help. An EMS team arrives at 4:10 am and attempts to perform CPR.

115.    Christopher was pronounced dead at SCCDOC at 4:45 am.

116.    Police did not inform Christopher's mother, Plaintiff Lorraine Fry, that her son was dead until noon on May 28, 2024.

117.    Through six days of suffering and visibly deterioration toward death, Christopher was never provided appropriate medical care, was never provided medication beyond baseline comfort medications, was never properly re-hydrated with intravenous fluids, and was repeatedly disbelieved and discounted when he made it clear that he was dying.

26

118.   Had VitalCore and SCCDOC employees properly evaluated and treated Christopher's obvious, life-threatening symptoms, including but not limited to his severe, prolonged dehydration, he would be alive today. Instead, Defendants carelessly and needlessly deprived Lorraine, Christopher's children, and Mary Ann, Christopher's girlfriend, of their beloved son, father, and partner.

119.   Unknown Medical Supervisor, with access to Christopher's medical file, had knowledge of Christopher's deteriorating state, his vomiting, his chest pains, his tachycardia, his scheduled cardiac exam, and his scheduled chest exam. Unknown Medical Supervisor was aware of all of these issues and failed to take action to provide the necessary medical care to Christopher.

120.   An autopsy revealed that Christopher had a necrotic esophagus when he died. The non-functioning esophagus was likely the cause of his death, a death that was entirely preventable.

## COUNT I
### WRONGFUL DEATH: MEDICAL MALPRACTICE[2]
### DEFENDANTS VITALCORE, NURSES CUMMINGS, EAVES, BAISCH, MCDANIEL, MILLER, SELLERS, DICKINS, BRUNE, UNKNOWN NURSE 1, NURSE PRACTITIONER MOCH, AND UNKNOWN MEDICAL SUPERVISOR

121.   Plaintiff incorporates all allegations set forth above.

122.   At all times relevant, VitalCore and the Nurse Defendants, Nurse Practitioner Defendant Moch, and Defendant Unknown Medical Supervisor (collectively, "Medical Defendants") had a duty to Christopher, individually and/or by and through its employees, to render medical services, care and treatment consistent with the medical requirements of its patients therein, and to use that degree of skill, care, and learning ordinarily provided by skillful, careful and prudent medical providers.

---

[2] Pursuant to RSMo § 538.225, Plaintiff will soon file an affidavit stating that Plaintiff's counsel has obtained a written statement from a legally qualified healthcare provider.

27

123.    At all times relevant, the Medical Defendants, individually and/or by and through its employees, had a duty to provide for the proper care and supervision of Christopher.

124.    At all times relevant, the Medical Defendants, individually and/or by and through its employees, had a duty to follow the proper medical and correctional standards, policies, rules, and/or regulations including those mandated by Missouri statutes.

125.    The Medical Defendants, individually and/or by and through its agents, employees, and/or representatives, breached their duty owed to Christopher in one or more of the following respects:

    a.    Failing to provide him access to medicine necessary to treat his life-threatening condition;

    b.    Failing to conduct proper COWS evaluations;

    c.    Failing to properly respond to his alarmingly high pulse rate;

    d.    Failing to believe his repeated pleas for access to a doctor or hospital;

    e.    Failing to conduct follow up evaluations on his reported chest pain;

    f.    Failing to record and report Christopher's inability to walk and constant vomiting;

    g.    Failing to properly report and record Christopher's symptoms so that he could received treatment from a doctor;

    h.    Failing to conduct an X-Ray on his allegedly broken ribs; and

    i.    Failing to take him to the hospital to address his medical distress and access intravenous fluids.

28

126.    As a direct and proximate result of the negligence and carelessness of the Medical Defendants as described above, Christopher died. Before Christopher's death, he suffered severe discomfort, pain, and mental anguish.

127.    The conduct of the Medical Defendants as described above demonstrates willful, wanton, and/or malicious conduct, and shows complete indifference to or conscious disregard for the safety of Christopher and others, justifying an award of damages for aggravating circumstances in such sum which will serve to punish the Medical Defendants and to deter them and others from like conduct in the future.

## COUNT II
## WRONGFUL DEATH
### DEFENDANTS SMITH, RODRIGUES, BELOW, YOUNT, UNKNOWN COs 1-4

128.    Plaintiff incorporates all allegations set forth above.

129.    Defendant COs each knew of Christopher's significant health issues and did not take any steps in order to address it.

130.    Being aware of a serious medical need and failing to obtain medical assistance demonstrates a wanton disregard for the life and safety of another.

131.    The Defendant COs as described above, committed these acts wantonly, needlessly, and with a reckless indifference to Christopher's rights.

132.    Defendant COs also had a ministerial duty that required them, under statute and by St. Charles County policy, to seek medical help when they are aware that such help is required.

133.    Because they failed to follow the ministerial duties required of them, Defendant COs are not entitled to official immunity.

29

134.    Christopher's death occurred as the direct and proximate result of the acts of the Defendant COs. But for those acts, Christopher would not have died, and his death was a reasonable and probable consequence of Defendants' acts and omissions.

**COUNT III:**
**42 U.S.C. 1983: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED AGAINST DEFENDANT NURSES CUMMINGS, EAVES, BAISCH, MCDANIEL, MILLER, SELLERS, DICKINS, BRUNE, UNKNOWN NURSE 1, NURSE PRACTITIONER MOCH, AND UNKNOWN MEDICAL SUPERVISOR**

135.    Plaintiff incorporates all allegations set forth above.

136.    Christopher suffered from several objectively serious medical conditions during his incarceration. Any layperson would have recognized that those symptoms required a doctor's attention and access to intravenous fluids in a hospital setting.

137.    As described in the foregoing paragraphs, Medical Defendants were all aware of Christopher's objectively serious medical conditions.

138.    Medical Defendants were deliberately indifferent to Christopher's serious medical needs when they failed to provide or obtain timely medical care for him in violation of his Fourteenth Amendment rights.

139.    As a pretrial detainee, Christopher had a clearly established right under the United States Constitution to be free from this deliberate indifference to his serious medical needs.

140.    As a further direct and proximate result of the conduct of these Defendants, Christopher was deprived of his right to be free from deliberate indifference to his medical needs under the Fourteenth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983.

141. Because Christopher lost his life, Lorraine Fry and the rest of Christopher's family have been deprived of Christopher's companionship, services, instruction, guidance, counsel and support.

142. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Christopher such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

143. Plaintiff also seeks an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT IV:**
**42 U.S.C. 1983:**
**UNCONSTITUTIONAL POLICY, CUSTOM, AND FAILURE TO TRAIN OR**
**SUPERVISE: VITALCORE HEALTH AND ST. CHARLES COUNTY**

144. Plaintiff incorporates all allegations set forth above.

145. Prior to May 2024, VitalCore agreed to recruit, contract, employ, train, compensate, and supervise medical professionals to provide medical services including, but not limited to, examinations, treatment, and care to all inmates housed at the St. Charles County Department of Corrections, including Christopher.

146. Accordingly, VitalCore was a willing participant with St. Charles County and/or its agents in the joint action that violated Christopher's Fourteenth Amendment rights under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

97. During the time Christopher was housed at SCCDOC, VitalCore had oversight and supervisory responsibilities over SCCDOC's policies, customs, procedures, and medical staff, including Nurse Defendants and Nurse Practitioner Defendants.

31

98.     During the time Christopher was housed at SCCDOC, SCCDOC's Sheriff, in conjunction with VitalCore and its employees, had direct supervisory and oversight responsibilities over VitalCore and St. Charles Couty's policies, customs, procedures, and staff, including, but not limited to, the policies and customs related to medical treatment for inmates, Christopher included.

99.     VitalCore and St. Charles County's policies, procedures, customs, practices, and actions – which, through the conduct and deliberate omissions of its employees and agents, were so widespread and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to inmates and inflicted injuries that are actionable under 42 U.S.C. § 1993.

100.     At the time of Christopher's death, healthcare staff were not properly checking vital signs, were routinely falsifying or incorrectly completing health checks, and were improperly implementing COWS monitoring. Defendant VitalCore and St. Charles County were aware that these failures were occurring and deliberately disregarded them.  These same defendants failed to discipline or supervise healthcare staff to improve these issues.

101.     VitalCore and St. Charles County's collective abdication of policy-making and oversight responsibilities and/or its inadequate policies, procedures, customs, practices, and actions – as well as its inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies – reached the level of deliberate indifference and resulted in a constitutional injury manifesting itself in the unnecessary and wanton infliction of pain.

102.     More specifically, VitalCore and St. Charles County's inadequate policies, procedures, customs, practices, and actions – as well as their inadequate training, supervision,

32

direction, and control that, if effective, would have eliminated those systemic deficiencies – caused the following systemic deficiencies:

a       Failed to implement a policy to provide newly arrived inmates experiencing opioid withdrawal with proper supervision;

b       Failed to implement a policy to provide newly arrived inmates experiencing opioid withdrawal with proper COWS Scale evaluations, in accordance with widely accepted national standards for COWS evaluations;

c       Failed to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up, including but not limited to life-threatening withdrawal symptoms;

d       Failed to implement a method to train employees to recognize, report, and escalate life-threatening withdrawal symptoms and serious medical issues to a medical doctor;

e       Failed to implement a policy to ensure inmates experiencing opioid withdrawal received proper access to intravenous fluids when necessary for hydration;

f       Delays or non-responses to noted urgent conditions;

g       Delegated clinical determinations to nursing personnel, who are neither qualified nor licensed to independently make such determinations;

h       Poor quality nursing, including failing to note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

i       Failed to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, and not providing adequate treatment; and

j       Utilized "conservative" treatment methodologies unless or until a medical condition becomes emergent – and often while a medical condition is emergent – in contravention of prevailing medical practices.

33

103.    The systemic deficiencies listed above are the product of official policies, procedures, customs, practices, and actions that were promulgated or tacitly authorized by VitalCore and St. Charles County and/or personnel vested with final decision-making authority, and all of them caused or materially contributed to the systematic and unconstitutional deliberate indifference to Christopher's serious medical needs and the unnecessary and wanton infliction of pain he experienced.

104.    The systematic deficiencies listed above demonstrate the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the employees of both VitalCore and St. Charles County that constitutes deliberate indifference to or tacit authorization of such conduct by VitalCore's policymaking officials after notice to the officials of that misconduct.

105.    VitalCore and St. Charles County's official policies, procedures, practices, and actions, which are the moving force behind Christopher's injuries, operated to deprive Christopher of the right to adequate and appropriate diagnosis and treatment of his serious medical needs, and, but for the same, he would not have been deprived of rights secured by the Fourteenth Amendment.

106.    Collectively, VitalCore and St. Charles County's acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to inmate health and safety, but said acts and omissions are also sufficiently harmful to illustrate a deliberate indifference to the serious medical needs of Christopher and the other inmates in their charge.

107.    These policies, practices, and customs were a cause of Christopher's death. Defendants VitalCore and St. Charles County are therefore culpable for the constitutional violations set forth above pursuant to *Monell v. NY Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

**Prior Unconstitutional Medical Provision from VitalCore**

34

108.    Although a young company, VitalCore has already been alleged to be responsible for the deaths of at least a dozen jailed people in the central part of the United States in the prior years before Christopher's death, and since Christopher's death.

109.    These prior incidents clearly demonstrate that VitalCore failed to adequately train its employees and that VitalCore employed unlawful customs leading to the deaths of many jailed individuals.

110.    On October 19, 2020, Jennifer Foster died while incarcerated at the Jackson County, Mississippi Adult Detention Center from Diabetic Ketoacidosis. Throughout her incarceration at the Jackson County jail, VitalCore employees failed to provide adequate screening or treatment for Jennifer's obvious symptoms of diabetic medical crisis, including confusion, incoherence, slurring, and periods of unconsciousness. These VitalCore employees were aware of Jennifer's diabetic condition and history of diabetic medical crisis due to uncontrolled diabetes. Their medical neglect led to her predictable death.

111.    On January 20, 2021, Joseph Mendes died by suicide at the Jefferson County, Missouri jail after being denied proper healthcare by VitalCore employees while experiencing drug withdrawal. Joseph's pleas for medical help were ignored throughout the evening and nighttime hours of January 19, 2021, and his cell was improperly monitored despite his obvious symptoms of suicidality. He died and 12:01am on January 20, 2021, and VitalCore medical staff took no lifesaving measures upon discovering his body.

112.    On or about May 15, 2021, Cory Alan Jackson died while incarcerated in solitary confinement at the Rankin County Detention Center in Rankin County, Mississippi, after experiencing psychosis, including severe hallucinations, delusions, and confused and disturbed thoughts. VitalCore nurses observed Cory's psychosis and erratic behavior throughout his

35

incarceration at the jail beginning the night of May 14, 2021, until his death the early morning of May 15, 2021. Despite their observations of Cory, these VitalCore employees assumed Cory was high on drugs and deliberately ignored his severe medical condition, failed to provide him with adequate medical care, and denied him access to medical care that proximately caused his untimely death. On May 15, 2021, drenched in sweat and naked except for a padded helmet that repeatedly slipped down over his nose and mouth, Cory thrashed against the restraints, increasing distress before collapsing against the chair, unresponsive just after 3:00 am. Cory was pronounced dead after being brought to a local hospital shortly after.

113. On September 21, 2021, Adam Blake Coker ("Blake") died from sepsis due to a ruptured appendix while incarcerated at the Rankin County, Mississippi Jail, after VitalCore employees denied his incessant pleas for medical care. When Blake was booked in the Rankin County Jail on September 15, 2021, he informed VitalCore medical staff that he was prescribed methadone and would experience severe withdrawal if he was not provided with methadone. Blake was illegally forced to withdraw from methadone, and experienced reported to medical staff that he would rather "kill himself than deal with the pain" of his detox. VitalCore staff responded by wrongfully noting that Blake was in "NO ACUTE MEDICAL DISTRESS" on his records. Throughout the following six days, Blake experienced severe withdrawal symptoms including chills, nausea, loose stool, difficulty walking, diffuse pain, and red marks on his skin which are a hallmark sign of sepsis. VitalCore nurses did nothing in response to being shown Blake's signs of sepsis even as these red marks grew larger and failed to properly respond to his withdrawal symptoms or provide him access to intravenous fluids as he became severely dehydrated. On the night of September 20 into the morning of September 21, 2021, Blake can be seen on video writhing in pain, begging for help, and frequently using the toiled due to nausea and diarrhea —

36

much like Christopher's final hours of life. VitalCore employees provided Blake with no further medical help, and he was found dead on his bunk at approximately 2:08 pm on September 2021, 2021.

114.   On October 18, 2021, Timothy Short died from hypoxemic respiratory failure secondary to COVID-19 pneumonia after surviving on a ventilator while in a comma for a month. One month earlier, on September 9, 2021, Timothy was incarcerated at the same St. Charles, County Missouri jail where Christopher died.  Timothy tested positive for COVID-19 at time he was arrested and taken into custody at the St. Charles County jail. He also lived with chronic heart and blood pressure conditions, for which he had a stent implanted and took various prescription medications. Throughout his incarceration at the St. Charles County jail, Timothy was denied all but one of his four necessary prescription medications by VitalCore employees. VitalCore staff failed to properly evaluate Timothy's respirations, COVID-19 symptoms, diarrhea, or shortness of breath, and instead reported that he was intentionally breathing shallowly. Eventually, this medical neglect led to Timothy collapsing and being taken to a local hospital, where he eventually fell into a coma and died.

115.   On December 16, 2023, Ashley Jo Raisbeck, a 27-year-old inmate housed at the Jefferson County Detention Facility in Colorado died alone, scared, and in agony from severe dehydration, anaphylactic shock, and intussusception because Nurse Practitioner Monical Jarrell of VitalCore poisoned and overdosed her with an antibiotic to which she was allergic – a synthetic type of penicillin in the cephalexin category that goes by the brand name, Keflex. This death was entirely preventable, as Ashley's medical records made her allergy clear, though it was ignored by VitalCore nurses. Additionally, like Christopher, Ashley was denied access to intravenous fluids after becoming severely dehydrated over the course of four days. When Ashley entered at

37

Stage 4 anaphylactic shock and so severely dehydrated that it was apparent she needed immediate IV fluids, Licensed Practical Nurse ("LPN") Shanda Baer could not get a blood pressure reading or hear a pulse, but instead decided to leave Ashley for an hour to "finish their rounds" instead of calling 911 and engaging Emergency Medical Services.

116.   In January 2023, Jefferson County, Missouri Jail detainee William Zinselmeier, diagnosed with diabetes and high blood pressure and taking prescribed medication, became too sick to get out of bed, eat, and ambulate. William was unable to walk out of his cell to retrieve his prescription medications and was punished for his immobility by being deprived of these medications. As the days passed, William's condition worsened and fellow detainees became increasingly concerned about him, as he was unable to drink water or eat food without immediately vomiting. William and other inmates requested medical help, medication, and voiced their concerns for his serious medical needs, including warning guards and nurses, and repeatedly pressing the emergency call button. William said several times, "I feel like I'm gonna die." His roommate told guards he was "dying." Despite these serious complaints, and requests for his prescription medication and treatment, VitalCore medical staff ignored the pleas. William also hadn't eaten in more than four days. Ten hours before he died, William fell out of bed and was unresponsive. William's earlier sick call and request for a nurse visit also went unheeded. In the early hours of January 7, 2023, William died as the result of VitalCore employees' deliberate indifference to his obvious and serious medical needs, including his well-known need for prescription medication, and ultimately his unresponsiveness.

117.   On June 30, 2024, Anthony Craig Myrick died after being denied medical care by VitalCore employees while incarcerated at the Madison County Detention Center in Canton, Mississippi. Anthony reported a perceived infection on his tongue in February 2024, which was

38

ignored for months until March 2024, when he was diagnosed with stage 3 tongue cancer and stage for lymph node cancer. Surgery was not ordered until April 2024, but by then, it was too late — Anthony's cancer metastasized throughout his body and he died in June 2024.

118.   VitalCore was on notice of each of the prior incidents.

119.   A common thread in these cases is that VitalCore has a policy, practice, or widespread custom of (1) purposefully denying inmates timely access to emergency medical treatment from a qualified medical provider for obvious medical emergencies; (2) severe understaffing; (3) failing to train and supervise nurses and medical providers to provide timely access to emergency medical treatment for medical emergencies, and then failing to retrain or discipline VitalCore employees for not providing timely access to qualified medical providers.

120.   Medical Defendants' failure to adequately treat and/or see Christopher is a direct result of VitalCore's understaffing of the jail, its failure to train Medical Defendants on how to recognize serious medical issues ,and of VitalCore's failures described in the foregoing paragraphs.

121.   There is a clear connection between VitalCore and St. Charles County's failures and customs and Christopher's death. St. Charles County and VitalCore's failures to train their employees were the moving force behind the failures that led to Christopher's death. Put differently, if St. Charles County and VitalCore had properly trained their employees, then Christopher's death would not have happened. Similarly, if VitalCore had not employed the customs and practices described above, Christopher would have received adequate and prompt medical care and not died.

122.   Furthermore, the conduct of VitalCore as described above demonstrates willful, wanton, and/or malicious conduct, and shows complete indifference to or conscious disregard for

the safety of Christopher and others, justifying an award of damages in such sum which will serve to punish VitalCore and to deter them and others from like conduct in the future.

123.    Plaintiff is entitled to recover reasonable attorney fees, costs, and expenses from Defendants, as provided by 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff requests that this Court enter Judgment against Defendants for compensatory damages and exemplary or punitive damages proven at trial; for reasonable attorney fees, costs, and expenses incurred herein as provided by 42 U.S.C. § 1983; and for such further legal and equitable relief as the Court may deem just and proper.

Dated: July 27, 2026                         **KHAZAELI WYRSCH, LLC**

*/s/ John M. Waldron*
John M. Waldron, 70401MO
Leah M. Fessler, 76824MO
James R. Wyrsch, 53197MO
Javad M. Khazaeli, 53735MO
911 Washington Avenue, Suite 211
St. Louis, Missouri  63101
(314) 288-0777
(314) 400-7701 (Fax)
jack.waldron@kwlawstl.com
leah.fessler@kwlawstl.com
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com

*Attorneys for Plaintiff*

40